**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>*v.*<br><br>**JOSE ALBERTO CORREA MORALES** | **CRIMINAL ACTION**<br><br>**NO. 26-CR-257** |

# MEMORANDUM

**Marston, J.** **November 13, 2026**

Defendant Jose Alberto Correa Morales has been charged by Indictment with: (1) one count of possession with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A); and (2) one count of conspiracy to distribute the same in violation of 21 U.S.C. § 846. (Doc. No. 1.) This case is scheduled for trial, with jury selection to begin on November 16, 2026. (Doc. No. 20.) On October 26, 2026, the United States of America (the "Government") submitted its Trial Memorandum, which disclosed for the first time that the Government intends to introduce at trial Defendant's post-arrest audio and video interview with police, which includes statements made by Defendant prior to being provided with his *Miranda* warnings.[1] Defendant objects to the

[1] The recording was provided to Defendant in discovery, however; the audio is very difficult to understand, and the Government did not provide a transcript until *after* the Government filed its Trial Memorandum and motions *in limine* on October 26, 2026. (Doc. Nos. 22–26.) Likewise, although the Government provided Defendant during discovery with copies of the reports documenting Defendant's arrest, those reports did not disclose Defendant's pre-*Miranda* statements, and instead, noted only that Defendant was provided his *Miranda* warnings and invoked his right to remain silent. (Doc. No. 29 at5.) It is thus unlikely that Defendant could have understood what was said in the video—let alone that the Government might rely on pre-*Miranda* statements—before the Government filed its Trial Memorandum and pretrial motions. Indeed, even then, the Government's only reference of its intention to offer the audio and video recording of Defendant's post-arrest interview in full appears in a footnote in the Government's Memorandum of Law in Support of its Motion to Admit Limited Video Excerpt for Voice Identification and Opinion Testimony. (Doc. No. 25, n.1.) The Government's lack of candor surrounding this issue meant that Defendant did not challenge the video evidence until he filed his response to the Government's motions on November 2, 2026. (Doc. No. 29.)

admission of any portion of his post-arrest interview. (Doc. No. 29.) The Court held oral argument on November 5, 2026. And the Court sustained Defendant's objection and granted his request to suppress the recording. For the reasons stated during oral argument and as further explained below, the Government is precluded from introducing any portion of Defendant's post-arrest interview.

## I. Factual and Procedural Background

The Government alleges that beginning in February 2026, the Pennsylvania Office of Attorney General Bureau of Narcotics and Drug Control and the Federal Department of Homeland Security Investigation began investigating a suspected bulk source of narcotics named "Amud." (Doc. No. 23 at 1.) During the course of this investigation an undercover ("UC") agent was introduced to and began communicating with Amud using WhatsApp text messages, phone calls, and video calls. (*Id.*) After one such video call, law enforcement identified Amud as Defendant. (*Id.*)

On April 8, 2026, Defendant agreed to sell the UC approximately 5,000 "blue buttons" which the UC knew to be fentanyl pills. (*Id.*) Defendant informed the UC that he was sending a driver to meet with the UC to sell him the pills. (*Id.* at 2.) The driver arrived; however, law enforcement approached the driver and arrested him. (*Id.*) At the time of his arrest, the driver was found in possession of 5,000 fentanyl pills. (*Id.*)

In the week that followed, Defendant and the UC continued to communicate, and Defendant agreed to come himself and sell the UC 5,000 fentanyl pills. (*Id.* at 3.) On April 13, 2026, Defendant arrived at a pre-arranged location in a red van driven by Defendant's brother. (*Id.*) Defendant asked the UC to get in the van, and Defendant provided the UC with a sample of the fentanyl pills he had available. (*Id.*) After examining the sample, the UC asked Defendant if

he had all the pills. (*Id.*) Defendant then handed the UC a white plastic bag containing approximately 5,000 fentanyl pills. (*Id.*) As Defendant and the UC were conducting this transaction, law enforcement approached the van and arrested Defendant. (*Id.* at 3–4.)

Defendant was transported to the Bensalem Police Department. (*Id.* at 4.) Upon arrival at the Police Department, Supervisory Agent John Martinez and Narcotics Agent Daniel Pellicciotti escorted Defendant to an interview room which was wired with audio and video recording equipment. (*Id.* at 4, 9.) The audio and video recording shows as follows:[2]

| | | |
|---|---|---|
| [3:24] | MARTINEZ: | Thanks brother. Hi, how you doin'. I'm Supervisory Narcotics agent John Martinez with the Attorney General's Office Bureau of Narcotics Investigations, okay. This is— |
| [3:41] | PELLICCIOTI: | Narcotics Agent Dan Pellicciotti. |
| [3:43] | MARTINEZ: | Okay. We want to talk to you about the incident that transpired today. |
| [3:50] | DEFENDANT: | Okay |
| [3:54] | MARTINEZ: | Alright. You want to talk to us, or no? |
| [3:55] | DEFENDANT: | Talk about? |
| [3:58] | MARTINEZ: | Talk about what. |
| [3:59] | DEFENDANT: | What you sayin', talk about? |
| [4:01] | MARTINEZ: | The incident that got you here. We'd like to |

[2] The Court has reviewed both the audio and video recording as well as the transcript which appears to conform with the recorded statement; however, as noted above, the audio is muffled and at times, difficult to understand.

| | | |
|---|---|---|
| | | speak to you, we'd like to *Mirandize* you and see if you want to talk to us. Your brother has also been arrested. |
| [4:15] | DEFENDANT: | Okay. |
| [4:15] | MARTINEZ: | Okay. |
| [4:16] | DEFENDANT: | He ain't have nothing to do with it. |
| [4:18] | MARTINEZ: | I'm sorry? |
| [4:19] | DEFENDANT: | He was just giving me a ride. That's it. That's all I can say. And I just wanna--. |
| [4:23] | MARTINEZ: | Well, it's not gonna be like that. [Papers rustling] |
| [4:30] | MARTINEZ: | This is Spanish. They mislabeled it. [Papers rustling]. You got an English one? |
| [4:40] | PELLICCIOTI: | Yeah yeah. |
| [4:41] | MARTINEZ: | That's your predominate language right, English? |

## II. Legal Standard

Defendant objects to the introduction of the post-arrest video and audio recording. As noted above, *see supra* n.1, Defendant's objection was raised in response to the Government's motions *in limine* and not as an independent motion to suppress the statements. (Doc. No. 29.) Nevertheless, because Defendant seeks suppression (*see id.* at 5), that is the standard by which the Court considers the objection. "Where a defendant seeks to suppress a post-arrest statement, the government bears the burden of establishing by a preponderance of the evidence that the

statement was not the product of custodial interrogation conducted in the absence of *Miranda* warnings." *United States v. DeSumma*, 44 F. Supp.2d 700, 703 (E.D. Pa. 1999) (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)). "In the absence of *Miranda* warnings, the government has the burden of establishing that the interrogation fits within a recognized exception to the *Miranda* rule." *Id.* (citing *Connelly*, 479 U.S. 157).

## III. Analysis

Defendant objects to the admission of any statements made before he received *Miranda* warnings as obtained in violation of his Fifth Amendment rights. (Doc. No. 29 at 5.) The Government claims the law enforcement agents were not interrogating Defendant at the time Defendant stated that his brother did not have anything to do with the transaction. (Doc. No. 31 at 5.) The Court does not agree.

Under *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Id.* The most well-known safeguard is the *Miranda* warning. It is undisputed that Defendant was in custody and had not received his *Miranda* warnings at the time he stated his brother did not have anything to do with the transaction. (*See* Doc. No. 31 at 4.)

Nevertheless, the Government maintains that Defendant was not being interrogated by law enforcement at that time he made statements about his brother's involvement. (*See* Rough Nov. 5, 2026 H'rg. Tr. at 8:9–13:5.) Interrogation arises "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446

U.S. 291, 300–01 (1980). Interrogation means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. To constitute interrogation, police conduct "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300. Under *Innis*, the test focuses on the suspect's perceptions and what the officer should have known, not the officer's subjective intent.

The Government argues that when Defendant said that his brother had "nothing to do with it," Defendant was not being interrogated because he had initiated a conversation with law enforcement. (Doc. No. 31 at 5.) This is not accurate. Agent Martinez asked Defendant if he "want[ed] to talk." Defendant asked the agents what they wanted to talk about. Agent Martinez then said, "The incident that got you here. We'd like to speak to you, we'd like to *Mirandize* you and see if you want to talk to us. Your brother has also been arrested." Law enforcement, *not* Defendant, initiated this conversation.

The Government's reliance on *United States v. Greene*, 927 F.3d 723 (3d. Cir. 2019) is, therefore, inapposite. In *Greene*, the defendant asked an unprompted question about his girlfriend. *Id.* at 725 (emphasizing that "Greene asked for the information he now claims coerced him into confessing"). Here, Defendant raised no subject at all; he merely asked what the agent wanted to discuss in response to the agent's request to talk, and the agent independently mentioned that Defendant's brother had been arrested. This statement was directed at Defendant, and it is not the type of statement that is "normally attendant to arrest and custody," nor was it necessary for the agent to carry out his duties at the time (i.e., informing Defendant of the charges against him and providing him with his *Miranda* warning). *Innis*, 446 U.S. at 301; *cf. United States v. Calisto*, 838 F.2d 711, 718 (3d Cir. 1988) ("McKeefry's remark

regarding the possible arrest of Calisto's daughter was not directed to Calisto, was the kind of remark that an officer would normally make in carrying out his duties under the circumstances that confronted him, and was not made in a provocative manner.").

The statement about the brother's arrest was also clearly meant to elicit an incriminating response from Defendant. *Innis*, 446 U.S. at 301; *see also United States v. Benton*, 996 F.2d 642, 644 (3d Cir. 1993) (recognizing that a suspect may "fe[el] compelled to respond to the arresting officer's statement" if, for example, "the police suggested that other members of [the defendant's] family were implicated in the crime, thus encouraging him to speak to accept sole responsibility"). Indeed, although the *Innis* test considers a reasonable officer and not the interrogating officer's subjective intent, here, the agent's actions confirm that he made the statement to prompt a response from Defendant: after mentioning Defendant's brother, the agent paused, then followed up with "[w]ell, it's not gonna be like that." It is only after Defendant incriminated himself that the agent proceeded to read him his *Miranda* warnings, and Defendant immediately invoked his right to silence.

In sum, we find that "under all the circumstances of the case," *Calisto*, 838 F.2d at 717, the agent's post-arrest questioning was an "interrogation" taken in violation of Defendant's Fifth Amendment rights.

## IV. Conclusion

Accordingly, Defendant's post-arrest statements made before he received *Miranda* warnings will be suppressed. An appropriate Order follows.